**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| ISLAND FARMS, LLC, PORTER PLANTING COMPANY PARTNERSHIP, and WYATT FARM PARTNERSHIP, on behalf of themselves and all others similarly situated,<br><br>        *Plaintiffs*,<br><br>v.<br><br>UMB BANK, N.A.,<br><br>        *Defendant*. | CIVIL ACTION NO.: 3:21-cv-721-HTW-LGI<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

COME NOW, Plaintiffs, Island Farms, LLC, Porter Planting Company Partnership and Wyatt Farms Partnership (hereinafter "Plaintiffs") and bring this action, for their own benefit and for the benefit of a class (the "Class") of persons similarly situated, against Defendant UMB Bank, N.A., and allege as follows:

### INTRODUCTION

1. This action concerns the injuries to Mississippi farmers who delivered grain to Express Grain Terminals (defined below as "Express Grain"), a grain elevator that, unbeknownst to them, was insolvent and being propped up by a lender, Defendant UMB Bank, N.A. ("The Bank").

2. The Bank placed tremendous pressure on Express Grain to fill its silos with farmers' grain during the fall harvest. During a brief window of time, those farmers would transfer title to the grain warehouse in anticipation of prompt payment.

3. Express Grain represented to farmers that it was prospering, when the truth, known to the Bank, was that it was insolvent. The Bank propped up Express Grain just enough to allow it to survive into harvest season, when farmers would be delivering enormous quantities of grain.

4. When the inevitable default occurred, the farmers went unpaid, and the Bank effectively seized the grain.

5. The Bank was in a much better position to understand the financial condition of Express Grain than the farmers. The Bank took advantage of Express Grain's misrepresentations and omissions concerning its financial stability in order to acquire more collateral. This lawsuit seeks to redress that injustice.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, and the action is brought between citizens of different states.

7. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), because the matter in controversy, the aggregated claims of the individual Class members, exceeds the sum of five million dollars, exclusive of interest and costs, and Plaintiffs, members of the proposed Class, are citizens of states different from Defendant. Under 28 U.S.C. § 1332(d)(5), there are more than 100 members of the proposed class.

8. This Court has personal jurisdiction over UMB because it has engaged in systematic and continuous business activity in Mississippi, and because a substantial amount of UMB's unlawful acts occurred in Mississippi and were intended to—and in fact did—cause substantial harm to persons in Mississippi.

9. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## PARTIES AND PERTINENT NONPARTIES

10. Plaintiff Island Farms, LLC ("Island Farms"), is a Mississippi limited liability company with its principal place of business in Holly Bluff, Yazoo County, Mississippi. Island Farms owns and operates a farm in the Mississippi Delta that grows corn, soybeans and other agricultural products.

11. Plaintiff Porter Planting Company Partnership ("Porter Planting") is a Mississippi general partnership with its principal place of business in Greenwood, Leflore County, Mississippi, whose partners are John Doty Porter, Gale McNear Porter, John Doty Porter, Jr., and Mary Gregory Porter, all adult residents of Greenwood, Leflore County, Mississippi. Porter Planting owns and operates a farming operation in the Mississippi Delta that grows corn, soybeans and other agricultural products.

12. Plaintiff Wyatt Farms Partnership ("Wyatt Farms") is a general partnership with its principal place of business in Tchula, Holmes County, Mississippi, whose partners are William T. Jones and Elizabeth P. Jones, both adult residents of Holmes County, Mississippi. Wyatt Farms owns and operates a farm in the Mississippi Delta that grows corn, soybeans and other agricultural products.

13. Defendant UMB Bank, N.A. ("UMB" or "the Bank") is a national banking association with its principal place of business in Kansas City, Missouri. UMB had assets of $33.13 billion as of 2020 and has particular expertise in agricultural finance.

## FACTUAL ALLEGATIONS

### The Business of Express Grain

14. Express Grain operates one of the largest grain elevator operations serving farmers in the Mississippi Delta.   Express Grain purchases and stores grain from Mississippi farmers and sells that grain on the open market.  Express Grain operated massive storage facilities as well as a related soybean processing facility.

15. Express Grain's purchases would involve a farmers' delivery of grain to it, transferring title on receipt by Express Grain.  Express Grain would then weigh, inspect and access the grain, and deliver payment in the form of a check within a period of a few days, or at another date if the farmer so desired.

16. Operation of a grain elevator has seasonal ebbs and flows of grain, with corresponding cash needs.  At harvest time, its cash needs are greatest, as it requires liquidity to pay farmers for their crops.  As it disposes of the grain, its cash needs diminish as purchasers pay for the grains they buy.

17. During the harvest season – late August and September for corn, through the end of October for soybeans – the silos would fill up as farmers deposited their harvests at Express Grain.  Peak flows occur at the end of September. The rest of the year, the silos operated at less than full capacity.

18. Express Grain operates in a competitive product market.  Although it is a significant player in the market, it faced real competition from other silos.  Farmers could sell their grain elsewhere.  Express Grain therefore had to compete with other silos on price, flexibility of terms, efficiency, timing and security.  To remain competitive, it painted a positive picture of its future, with rosy forecast throughout 2021.

**The Bank, as the Primary Lender, Had Extraordinary Leverage Over Express Grain**

19. Express Grain was highly leveraged, with massive amounts of debt. Its principal creditor was the Bank. The Bank extended loans to Express Grain in or around November 2015. According to the Bank, the operative loan agreement between the Bank and Express Grain is the "Fourth Amended and Restated Loan and Security Agreement" (the "Loan Agreement"), last complete revision as of December 2020 (subject to four further amendments agreed to in 2021).

20. According to the Bank, as of September 2021, the total balance of the loans was approximately $70 million; $37 million was the balance on a revolving loan (with a maximum balance of $40 million, the "Revolving Loan") and $33 million was the balance on a term note.

21. The balance of the Revolving Loan, as per the amendments made in December 2020, was contractually required to be reduced during 2021. Express Grain was *required* to make payments sufficient to decrease the Revolving Loan balance from (a maximum of) $40 million to $30,000,000 for the period from May 1 through May 31, 2021, and then to $25,000,000 for the period from June 1 through the maturity date of the Revolving Loan, which is October 31, 2021

22. Express Grain was required to furnish audited financial statements to the Bank within 120 days of the end of its fiscal year, which ends December 31.

23. The Bank forced Express Grain to post collateral. Virtually all of its assets were collateralized, as the Loan Agreement gave the Bank a "continuing security interest upon all property of [Express Grain], whether then owned or existing or thereinafter created, acquired, or arising and wherever located."

24. The most valuable collateral securing the Bank's loans was the grain held by Express Grain. The amount that Express Grain could borrow under the Revolving Loan was determined in part by the amount of its grain inventory.

25. Express Grain was required to provide UMB periodically with a "Borrowing Base Certificate" certifying as true and complete by the president and controller of the Borrowers, the Borrowing Base Amount and each of its components. It was also required to provide to the Bank a "compliance certificate" within forty-five (45) days after the end of each fiscal quarter containing a computation of the financial covenants and stating that Express Grain has not become aware of any event of default.

26. The volume of grain held by Express Grain is, predictably, greatest at the conclusion of the harvest season. For most crops, the harvest in the Mississippi Delta occurs in the autumn.

### Express Grain Was in Financial Distress Throughout 2021

27. Throughout 2021, Express Grain was in financial distress.

28. In fact, its financial condition had been deteriorating for some time. For example, cash on hand decreased from $1,200,000 in 2018, to $641,000 in 2019 down to almost zero at the end of 2020 at $3,865.

29. The Bank contends that Express Grain was in violation of provisions limiting its operating debts to $50,000 and limiting its capital expenditures to $1,000,000.

30. Upon information and belief, Express Grain's financial statements were frequently delivered late, and were delivered late for the 2018, 2019 and 2020 fiscal years. The Bank tolerated this lateness.

31. Upon information and belief, the audited financial statement for the fiscal year ending December 31, 2020, was delivered over 120 days late, and it was qualified (meaning that there was either a scope limitation, an issue discovered in the audit of the financials that were not pervasive, or an inadequate footnote disclosure). In that financial statement, upon information

and belief, the auditor determined that there was substantial doubt about Express Grain's ability to continue as a going concern within one year after the date that the financial statement was issued.

32.     Thus, by the spring of 2021, Express Grain was effectively insolvent, and being kept alive only by the forbearance of the Bank. The Bank was aware that if it called the loan then, there would be little grain it could claim as security for Express Grain's debt. The Bank was also aware then that if it called the loan in late September in the height of the harvest season for corn and soybeans, the Express Grain elevator would likely be filled with grain upon which it could claim a priority lien.

33.     The Bank therefore proposed sometime in the spring of 2021 to wait until the elevator had collected as much grain as practicable during the 2021 corn and soybean harvest from unsuspecting farmers, including Plaintiffs, and then move to call the loan and place Express Grain into bankruptcy. In short, the Bank laid a trap for Plaintiffs and the other members of the class, a trap to steal their crops and use those crops to satisfy the massive loan it had improvidently made to Express Grain.

34.     During the course of 2021, there was an extended series of communications and negotiations between Express Grain and the Bank.  As the loans were non-performing, the Bank understood the economic pressures that Express Grain was under.

35.     Express Grain was unable to make payments sufficient to reduce the balance of the Revolving Loan, which was contractually required to be reduced from (a maximum of) $40 million to $25 million by June 2021.  The Bank and Express Grain modified the Loan Agreement at least four times (in February, April, May and June 2021) because of Express Grain's difficulty in making payments.  The amendments permitted Express Grain to keep the balance of the Revolving Loan as high as $40 million throughout 2021.

36.     In effect, these amendments permitted Express Grain *to remain in business*, as Express Grain was simply unable to reduce the balance of the Revolving Loan as it had agreed to do back in December 2020.  The Bank had an incentive *not* to foreclose on Express Grains in the spring, and to keep Express Grain afloat until the fall harvest season, so that Express Grain would acquire more collateral that could be foreclosed upon.

**While Express Grain Was in Distress, a Fact Known to the Bank, Express Grain Fraudulently Touted its Financial Health to Farmers and Aggressively Solicited Grain Deliveries**

37.     Under the terms of its agreements with the Bank, Express Grain was under pressure to maintain, and report to the Bank, large grain inventories. Accordingly, in order to continue to borrow funds, it had an incentive to encourage farmers to deliver large volumes of grain, regardless of whether Express Grains had the ability to pay for them.

38.     In the spring of 2021, Express Grain issued a "spring update" that made sunny predictions about the future of the company.  Express Grain began by stating that there were "some exciting things going on here at Express Grain" touting that Express Grain "continue[d] with [its] growth and expansion" and affirmed that "we are able to continue to meet your needs and improve our services."  The update touted expansion to Express Grain's soybean processing plant.  It touted high market prices for corn and soybeans, and demand for soybean oil.  Most importantly, it touted its own financial condition:

> We are excited to see another crop go in the ground. We are looking forward to another busy fall, and *this time we'll be more prepared financially* having moved our fiscal year to the calendar year as opposed to June 30. June 30 is good physical cutoff for old/new crop, but the calendar fiscal year will give us more time to have our inventory financing secured and in place in time for harvest, so things will run like normal. We all have a lot to look forward to this coming year. Let's make the most of it! (emphasis added)

39.     As late as September 28, 2021, Express Grain sent an email to customers that reassured them of the solvency and its ability to pay for grain deliveries:

8

> Express Grain Customers and Friends,
>
> I hope everyone is having a great harvest this year. I wanted to update you all on how we are doing. This harvest Express Grain has received approximately 7.5 million bushels of corn! This is the 2nd largest in our history just behind 2013. A lot of this was made possible due to the inverted market and high moisture harvesting program. We have shipped approximately 6.5 million bushels of corn out to the market. We have to thank the CN railroad for doing an excellent job of keeping trains rolling in and out of our Sidon Facility, and for you getting it out of the field! We are so thankful a large portion got their corn out of the field and to market before the Hurricane. Soybeans are rolling in as well. Due to issues with the river this year, we are definitely going to see more bushels come our way. We are steadily crushing beans, and will start shipping trains of beans so we have ample space for everyone. *I also wanted to let you know that we are in good shape financially. We have funding in place from multiple sources to make sure everyone gets paid on time. Stay safe out there and keep those combines rolling!*
>
> Sincerely,
> John Coleman
> President
> Express Grain Terminals (emphasis added)

40. At the time Express Grain made the foregoing representations, the Bank knew that they were false, that Express Grain was teetering on bankruptcy, and knew that these misrepresentations would induce many farmers to bring their crops to Express Grain. Yet the Bank allowed these misrepresentations to be made and not corrected by the Bank or Express Grain.

41. Express Grain with the acquiescence and encouragement of the Bank, hired agents to visit farmers during the summer and even offered bonuses and other inducements such as accepting grain with an excessive moisture content, in order to convince more farmers to deliver more grain to Express Grain.

42. The Bank knew that Express Grain's financial condition was dire, and that it would be unable to pay for the voluminous grain deliveries it would receive in harvest season.

43. The Bank had superior knowledge about Express Grain's financial condition than Plaintiffs and other farmers and had.

44. Express Grain had a duty to disclose the adverse financial condition of Express Grain to Plaintiffs and the Class, because (1) this information was necessary and material to transactions entered by farmers with Express Grain, (2) was necessary to render not misleading affirmative statements made by Express Grain about its financial condition, and (3) Express Grain had special knowledge about these facts that was not possessed by Plaintiffs and other farmers.

45. Farmers, including Plaintiffs and the Class, relied to their detriment on the purported financial health of Express Grains. If Plaintiffs had known of Express Grain's inability to pay, they would not have delivered their crops to Express Grain, and would have, instead, brought them elsewhere.

46. Due to Express Grain's affirmative misrepresentations about its financial condition, and its failure to disclose its distressed financial condition, Plaintiffs and the Class continued to deliver grains to Express Grain during the fall harvest season.

47. For example, Island Farms, LLC delivered 80,000 bushels of corn to Express on or about September 13-18, 2021. Express Grain "paid" Island Farms with a check for $410,874.33. The check bounced on 9/29/2021.

48. By September 29, 2021, as is typical during harvest season, Express Grain's silos were filling up with grains.

49. The only beneficiary of these grain deliveries was the Bank. The Bank benefitted by the delivery of additional collateral that it could later foreclose upon.

50. But the farmers who delivered grains to Express Grain in this time frame were *not* paid for their deliveries. In fact, several checks to farmers written by Express Grain bounced. Instead of being paid for their deliveries, the farmers were, in effect, just handing their crops to the Bank without any compensation.

**The Collapse of Express Grain**

51. On September 24, 2021, the Bank gave notice to Express Grain that the Bank had "elected to accelerate the Indebtedness, and declared all amounts owing under the Loan Documents immediately due and payable in full."

52. On or about September 28, 2021, the Bank filed a petition, styled *UMB Bank, N.A. v. Express Grain Terminals, LLC, et al.*, No. 21-CV-106 (Chancery Ct. Leflore Cnty., Mississippi), seeking the appointment of a receiver over Express Grain.

53. The Bank knew that its filing of the receivership petition would cause Express Grain to seek the protection of the bankruptcy laws.

54. On or about September 29, 2021, the Express Grain Entities filed a series of petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Mississippi.

55. The Bank has essentially taken legal title to the grains delivered by Plaintiffs and the Class, based on the security interest provided by its agreements with Express Grain.

## CLASS ACTION ALLEGATIONS

56. This action is brought as a plaintiffs' class action pursuant to Fed. R. Civ. P. 23(b)(3). Plaintiffs bring this action on their own behalf, and on behalf of all others similarly situated, as representatives of the following Class:

> All persons and entities that deposited agricultural products with Express Grain, and who did not receive payment for those products, from January 1, 2020, to October 31, 2021.
>
> Excluded from the Class are persons directly or indirectly owned or operated by Defendants or Defendants' affiliated entities, and federal, state, and local government entities.

57. The members of the Class are readily identifiable from the records of Express Grain.

58. Upon information and belief, the Class consists of hundreds of members, and is therefore so numerous that individual joinder of all members is impracticable.

59. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual members of the Class. The wrongs suffered and remedies sought by Plaintiffs and the other members of the Class are premised upon a uniform unlawful scheme perpetuated by Defendants. Questions common to the Class include, but are not limited to, the following:

  (a) Did Express Grain fraudulently represent its financial condition?

  (b) Did Express Grain have a duty to accurately disclose to farmers its actual financial condition?

  (c) Did the Bank know that Express Grain was financially distressed?

  (d) When did the Bank know that Express Grain was financially distressed?

  (e) Did the Bank prop up Express Grain until the fall 2021 harvest season?

  (f) Did the Bank benefit from Express Grain's fraudulent conduct?

  (g) Would it be unjust for the Bank to retain its benefits from Express Grain's wrongful conduct?

  (h) Did the Bank exercise exclusive dominion or control over grain delivered to Express Grain?

60. Plaintiffs' claims are typical of those of the Class, and are based on the same legal theories as those of the Class members. Plaintiffs' claims and those of the Class members all arise from the same pattern or practice by the Defendants, set out above.

61. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel who are highly experienced and competent in complex consumer class-action litigation, and Plaintiffs and their counsel intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have any interests that might cause them not to

vigorously pursue this action. Plaintiffs' interests are coextensive with those of the Class, and Plaintiffs have no interests adverse to those of the Class members.

62. Plaintiffs have made arrangements with their counsel for the discharge of their financial responsibilities to the Class. Plaintiffs' counsel have the necessary financial resources to adequately and vigorously litigate this class action.

63. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. It is desirable to concentrate the litigation of the claims in this forum, because the damages suffered by the individual Class members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. Moreover, the individual Class members are unlikely to be aware of their rights. Thus, it is unlikely that the Class members, on an individual basis, can obtain effective redress for the wrongs done to them. Additionally, the court system would be adversely affected by such individualized litigation. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase delay and expense to all parties and the court system from the issues raised by this action. In contrast, the class-action device provides the benefit of adjudication of these issues in a single proceeding, with economies of scale and comprehensive supervision by a single court.

## **CLAIMS FOR RELIEF**
## **COUNT I**

### **AIDING AND ABETTING FRAUD**

64. Paragraphs 1 through ___ are incorporated here by reference, as if set forth in full.

65. Express Grain intentionally and unlawfully (1) made knowingly false representations, intending that the representations be relied upon, and (2) intentionally and unlawfully omitting and/or concealing information that it had a duty to disclose.

13

66. Express Grain affirmatively misrepresented that its financial condition was strong, and failed to disclose that is financial condition was actually quite dire.

67. Express Grain's misrepresentations were designed to induce reliance.

68. Express Grain had a duty to disclose its adverse financial condition to Plaintiffs and other farmers with whom it did business, because (1) this information was necessary and material to transactions entered by farmers with Express Grain, (2) was necessary to render not misleading affirmative statements made by Express Grain about its financial condition, and (3) Express Grain had special knowledge about these facts that was not possessed by Plaintiffs and other farmers.

69. As a result of these representations and/or omissions, Plaintiffs and the Class delivered grain to Express Grain that they would not have delivered had they known the truth.

70. Express Grain's false representations and omissions were material and were made and omitted intentionally and recklessly.

71. The Bank knew or should have known of the violation by Express Grain.

72. The Bank gave substantial assistance and/or encouragement to Express Grain to engage in the tortious conduct.

73. The Bank aided and abetted the fraud perpetrated by Express Grain by remaining silent with full knowledge that Express Grain's customers would deliver their products without being paid for them, and propping up Express Grain until such time, and only until such time, as area farmers, including Plaintiffs and the Class, would deliver their crops during harvest season.

## COUNT II

## CONVERSION

74. Paragraphs 1 through 73 are incorporated here by reference, as if set forth in full.

75. The Bank acted, with intent, to exercise exclusive dominion and control over grain, for which Plaintiffs and other farmers had the true owner's right.

76. Plaintiffs and the Class had several ways of Express Grain dealing in their grain. One was that they could deliver the grain to Express Grain, and Express Grain would "purchase" the grain. As previously alleged, there would be a period of a few days when Express Grain would weigh, inspect and access the grain.  Later on, Express Grain might deliver payment in the form of a check.  Some checks were not issued.   Some checks were issued but bounced.

77. During the period between Express Grain receiving the grain and paying for it, there might nominally be some kind of interest in Express Grain, from exchanging a legal instrument, such as warehouse receipts.  But there was a key span of time between Express Grain receiving the grain, and, its payment.  During that time, there certainly continued to be equitable title in the farmers.  Because of the Bank's knowledge, it was not a holder in due course of warehouse receipts granting an interest.  And, the transaction of sale had not "closed."

78. Additionally, there were legal aspects that meant sometimes the farmers had more than equitable title. The purpose of Express Grain nominally having legal title via exchanging a legal instrument was in furtherance of transactions to pay actual money to the farmers. The farmers thus had, in addition to equitable title, a constructive trust over the grain for the purpose of their getting paid actual money.

79. In these and other respects, the farmers were the true owners with right to the grain "purchased" by Express Grain.

80. Additionally, the farmers had not just ownership but possession of the grain from the date of harvest to the delivery to Express Grain for any purpose. The farmers could have delivered the grain elsewhere, such as to a competing grain elevator. But they were in the course of surrendering that grain to Express Grain's possession. Although they were being misled into what they did, at this time the farmers were the true owners with the right to the grain, with full legal and equitable title and possession.

81. During this time, the Bank, with aid from Express Grain, acted fully, and with intent, to exercise exclusive dominion or control over the grain and over legal instruments related to the grain.

82. Namely, the Bank used a variety of methods to have the farmers put the grain in possession of Express Grain in a way that would allow the Bank to exercise dominion or control. The Bank conducted extensive but concealed banking operations to transfer whatever Express Grain possessed, including the farmers' grain, to come under the Bank's dominion. The Bank took advantage of Express Grain's financial vulnerabilities to acquire increasingly complete control over what Express Grain possessed. At the same time, the Bank concealed its banking operations, including audits, and imposition of conditions. Fraud was among the methods to have the farmers put the grain in Express Grain.

83. Also, Express Grain, in concert with the Bank, misled the farmers to choose, with their just-harvested grain, to bring it to Express Grain. Express Grain and the Bank were wrongful in presenting the farmers with the inaccurate picture that the farmers could expect rapid payment in actual money. In fact, the accurate picture was that the farmers could expect grave doubt, at best, about payment in actual money. Misleading the farmers was a key method by which the Bank came to exercise dominion or control over the grain.

84. Plaintiffs' and the Class's damages were the value of the farmers' grain and their rights to the grain and to payment. This was at the time and place when the Bank exercised dominion or control.

## COUNT III

### UNJUST ENRICHMENT

85. Paragraphs 1 through 84 are incorporated here by reference, as if set forth in full.

86. The Bank was the beneficiary of the fraud perpetrated by Express Grain.

87. The Bank was enriched by increasing its profits, or alternatively substantially mitigating its losses, at the expense of farmers who delivered grain, without compensation, to Express Grain on the eve of its bankruptcy.

88. The Bank has taken and holds property of Plaintiffs and all the members of the class which in good conscience, equity and justice, the Bank should not retain.

89. The Bank has been enriched unjustly at the expense of Plaintiffs and the Class.

90. Therefore, Plaintiffs demand disgorgement of all ill-gotten funds, gains, profits and benefits received by The Bank as a result of its conduct, and the wrongful conduct of Express Grain.

## COUNT IV

### CONSTRUCTIVE TRUST

91. Paragraphs 1 through 90 are incorporated here by reference, as if set forth in full.

92. A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, to hold and enjoy.

93. The Bank obtained ownership of the farmers' crops and their proceeds by means involving misrepresentations, as listed, and inequitable means, as listed, made by Express Grain.

94. The misrepresentations include fraud, artifice, concealment, and failing to disclose.

95. The listed misrepresentations include, but are not limited to, those to the effect that the Express Grain was in good financial condition, would pay the farmers for crops, was not near insolvency, and that its payments by check or otherwise were sound.

96. The listed inequitable means include unconscionable conduct, artifice, or questionable means, or against equity and good conscience, obtaining or holding the legal right to the farmers' grain, which the Bank ought not, in equity and good conscience, to hold and enjoy.

97. The listed inequitable means include, but are not limited to, tactics to induce farmers to surrender possession of their grain, take payments by check or otherwise that were not sound, make Express Grain appear in good financial condition and not near insolvency, and sell or transfer the farmers' grain to buyers or other transferees, whether or not the grain continued to be proceeds from the farmers' sale.

## DAMAGES AND OTHER RELIEF SOUGHT

98. The foregoing paragraphs are incorporated here by reference, as if set forth in full.

99. Plaintiffs seek certification of a Class of similarly situated persons as defined above.

100. As a result of Defendants' aforesaid misconduct, Plaintiffs seek recovery, for themselves and the Class, of all available damages, including—but not limited to—compensatory, punitive and exemplary.

101. Plaintiffs seek forfeiture, for themselves and the Class, of all money received by Defendants, directly or indirectly, through the conduct alleged herein.

102. Plaintiffs seek restitution, for themselves and the Class, of all illegally obtained or ill-gotten funds and gains received by the Defendants

103. Plaintiffs seek pre-judgment interest, post-judgment interest, attorneys' fees, court costs, investigative costs, expert-witness fees, deposition fees and any other expenses or damages which this Court deems proper.

## JURY TRIAL DEMAND

104. Plaintiffs demand a jury trial.

Dated: November 8, 2021

/s/ *Don Barrett*
John W. ("Don") Barrett (MSB #2063)
Katherine Barrett Riley (MSB #99109)
Sterling Aldridge (MSB #104277)
David McMullan, Jr. (MSB #8494)
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095
Telephone: (662) 834-2488
donbarrettpa@gmail.com
kbriley@barrettlawgroup.com
saldridge@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Jonathan W. Cuneo
Monica Miller
Jennifer E. Kelly
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
monica@cuneolaw.com
jkelly@cuneolaw.com