**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| ISLAND FARMS, LLC; PORTER PLANTING COMPANY PARTNERSHIP; and WYATT FARM PARTNERSHIP, on behalf of themselves and all others similarly situated,<br><br>      *Plaintiffs,*<br><br>v.<br><br>UMB BANK, N.A.,<br><br>      *Defendant.* | Civil Action No.  3:21-CV-721-HTW-LGI<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

COME NOW Plaintiffs, Island Farms, LLC; Porter Planting Company Partnership; and Wyatt Farms Partnership (hereinafter "Plaintiffs") and bring this action, for their own benefit and for the benefit of a class (the "Class") of persons and entities similarly situated, against Defendant UMB Bank, N.A., and allege as follows:

## INTRODUCTION

1.  This action concerns the injuries to Mississippi farmers who delivered grain to Express Grain Terminals, LLC ("Express Grain"), a grain dealer that, unbeknown to them, was insolvent and being propped up by a lender, Defendant UMB Bank, N.A. ("The Bank").[1]

2.  The Bank, fully aware that there was substantial doubt that Express Grain was or could continue to be a going concern, and aware that Express Grain's terrible financial condition would jeopardize its license to do business if the true facts were known, chose to enable and sustain Express Grain in order to permit Express Grain to fill its silos with farmers' grain during

---

[1] Express Grain and certain affiliated business entities have filed for bankruptcy protection. Plaintiffs do not intend to name any of the Express Grain entities as defendants in this action.

the fall harvest.  During that brief window of time, farmers, including Plaintiffs and Class members, would deliver their grain to the grain warehouse in anticipation of prompt payment.

3.      Express Grain represented to farmers that it was prospering, when the truth, known to the Bank, was that Express Grain was insolvent.  The Bank propped up Express Grain just enough to allow it to survive into harvest season, when farmers would be delivering enormous quantities of grain.

4.      When the inevitable default occurred, the farmers went unpaid, and the Bank effectively seized the grain.

5.      The Bank was in a much better position to understand the financial condition of Express Grain than the farmers. Despite being aware of Express Grain's financial dire straits, the Bank took advantage of Express Grain's misrepresentations and omissions concerning its financial stability, and in fact made fraudulent misrepresentations itself, in order to acquire more collateral.  This lawsuit seeks to redress that injustice.

6.      The Bank had actual knowledge of the insolvency of Express Grain for years prior to 2021. This knowledge came from audited financial reports, from the transactions Express Grain had with various accounts at the Bank as well as through the right of the Bank to enter and inspect all information at Express Grain pursuant to loan agreements. As a result of this superior knowledge, the Bank was well aware of the course of dealings of Express Grain with farmers. In 2021, not only did the Bank rework loan agreements with Express Grain four (4) times, it changed its course of dealing with the grain delivered by Plaintiffs and the Class. As further evidence of bad faith and fraud, the Bank altered its practices and required Express Grain to issue warehouse receipts to the Bank to leverage its claim of ownership of any grain delivered by Plaintiffs and the Class and thereby claiming the grain as its own.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, and the action is brought between citizens of different states.

8.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), because the matter in controversy, the aggregated claims of the individual Class members, exceed the sum of five million dollars, exclusive of interest and costs, and Plaintiffs, members of the proposed Class, are citizens of states different from Defendant.  Under 28 U.S.C. § 1332(d)(5), there are more than 100 members of the proposed class.

9.      This Court has personal jurisdiction over the Bank because it has engaged in systematic and continuous business activity in Mississippi, and because a substantial amount of the Bank's unlawful acts occurred in Mississippi and were intended to—and in fact did—cause substantial harm to persons in Mississippi.

10.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## PARTIES AND PERTINENT NONPARTIES

11.      Plaintiff Island Farms, LLC ("Island Farms"), is a Mississippi limited liability company with its principal place of business in Holly Bluff, Yazoo County, Mississippi.  Island Farms owns and operates a farm in the Mississippi Delta that grows corn, soybeans and other agricultural products.

12.      Plaintiff Porter Planting Company Partnership ("Porter Planting") is a Mississippi general partnership with its principal place of business in Greenwood, Leflore County, Mississippi, whose partners are John Doty Porter, Gale McNear Porter, John Doty Porter, Jr., and

Mary Gregory Porter, all adult residents of Greenwood, Leflore County, Mississippi. Porter Planting owns and operates a farming operation in the Mississippi Delta that grows corn, soybeans and other agricultural products.

13.     Plaintiff Wyatt Farms Partnership ("Wyatt Farms") is a general partnership with its principal place of business in Tchula, Holmes County, Mississippi, whose partners are William T. Jones and Elizabeth P. Jones, both adult residents of Holmes County, Mississippi. Wyatt Farms owns and operates a farm in the Mississippi Delta that grows corn, soybeans and other agricultural products.

14.     Defendant UMB Bank, N.A. is a national banking association whose principal place of business is 1010 Grand Avenue, Kansas City, Missouri.  The Bank had assets of $33.13 billion as of 2020 and has particular expertise in agricultural finance.

## FACTUAL ALLEGATIONS

### The Business of Express Grain

15.     Express Grain operates one of the largest grain dealer operations serving farmers in the Mississippi Delta.  Express Grain purchases and stores grain from Mississippi farmers and sells that grain on the open market.  Express Grain operated massive storage facilities as well as a related soybean processing facility.

16.     Express Grain's purchases would involve a farmers' delivery of grain to it, which allegedly would transfer title to Express Grain.  Express Grain would then weigh, inspect and access the grain, and deliver payment in the form of a check within a period of a few days, or at another date if the farmer so desired.

17.     Operation of a grain elevator has seasonal ebbs and flows of grain, with corresponding cash needs.  At harvest time, its cash needs are greatest, as it requires liquidity to

4

pay farmers for their crops.  As it disposes of the grain, its cash needs diminish as purchasers pay for the grains they buy.

18.     During the harvest season – late August and September for corn, through the end of October for soybeans – the silos would fill up as farmers deposited their harvests at Express Grain.  Peak flows occur at the end of September. The rest of the year, the silos operated at less than full capacity.

19.     Express Grain operates in a competitive product market.  Although it is a significant player in the market, it faced real competition from other silos.  Farmers could sell their grain elsewhere.  Express Grain therefore had to compete with other silos on price, flexibility of terms, efficiency, timing and security.  To remain competitive, it solicited farmers and painted a positive picture of its financial stability, with rosy forecast throughout 2021.

20.     Express Grain, is subject to financial regulation by the Mississippi Department of Agriculture and Commerce (the "MDAC").  The MDAC is statutorily obligated to protect the interest of farmers by monitoring the financial well-being of operators of grain dealers.  If an operator is not sufficiently solvent, and presents a substantial financial risk to those farmers who do business with it, the MDAC can, and will, shut the grain dealer down.

21.      Farmers rely heavily on the licensing and review of the MDAC to determine whether it is safe to do business with a grain dealer. It is understood by farmers, and those engaged in agricultural finance (including the Bank), that information provided to the MDAC concerning grain dealers is relied upon by farmers in their specific transactions with the grain dealers, and in grain transactions generally.

**The Bank, as the Primary Lender, Had Extraordinary Leverage Over Express Grain**

22.     The Bank holds itself out as having expertise in agribusiness and agribusiness lending. *See* https://www.umb.com/business-banking/why-umb/industry-expertise/agribusiness

(last accessed January 6, 2022). The Bank is ranked 28th of the top 100 farm lenders by farm loan volume for the third quarter of 2021. *See* Top 100 Farm Lenders Ranked by Dollar Volume, https://www.aba.com/-/media/documents/data/top100agbanksbydollarvolume.pdf?rev=808612a04d11466286b1752d2338dfd2 (last updated Dec. 3, 2021 and last accessed January 6, 2022).

23.     From its advantageous position, the Bank could see that Express Grain was highly leveraged, with massive amounts of debt, but chose to look away.  Express Grain's principal creditor was the Bank.  The Bank extended loans to Express Grain in or around November 2015. According to the Bank, the operative loan agreement between the Bank and Express Grain is the "Fourth Amended and Restated Loan and Security Agreement" (the "Loan Agreement"), last complete revision as of December 2020 (subject to four further amendments agreed to in 2021).

24.     According to the Bank, as of September 2021, the total balance of the loans was approximately $70 million; $37 million was the balance on a revolving loan (with a maximum balance of $40 million, the "Revolving Loan") and $33 million was the balance on a term note.

25.     The balance of the Revolving Loan, as per the amendments made in December 2020, was contractually required to be reduced during 2021.  The Bank required Express Grain to make payments sufficient to decrease the Revolving Loan balance from (a maximum of) $40 million to $30,000,000 for the period from May 1 through May 31, 2021, and then to $25,000,000 for the period from June 1 through the maturity date of the Revolving Loan, which is October 31, 2021

26.     The Bank required Express Grain to furnish audited financial statements to the Bank within 120 days of the end of its fiscal year, which ends December 31.

27.     The Bank required Express Grain to post collateral.  Virtually all of its assets were collateralized, as the Loan Agreement gave the Bank a "continuing security interest upon all property of [Express Grain], whether then owned or existing or thereinafter created, acquired, or arising and wherever located."

28.     The most valuable collateral securing the Bank's loans was the grain held by Express Grain.  The amount that Express Grain could borrow under the Revolving Loan was determined in part by the amount of its grain inventory.

29.     The Bank had actual knowledge of the insolvency of Express Grain for years prior to 2021.  This knowledge came from audited financial reports, from the transactions Express Grain had with various accounts at the Bank as well as through the right of the Bank to enter and inspect all information at Express Grain pursuant to loan agreements.  As a result of this superior knowledge, the Bank was well aware of the course of dealings of Express Grain with farmers.  In 2021, not only did the Bank rework loan agreements with Express Grain four (4) times, it changed its course of dealing with the grain delivered by Plaintiffs and the Class.  As further evidence of bad faith and fraud, the Bank altered its practices and required Express Grain to issue warehouse receipts to the Bank to leverage its claim of ownership of any grain delivered by Plaintiffs and the Class and thereby claiming the grain as its own.

30.     Express Grain was required to provide the Bank periodically with a "Borrowing Base Certificate" certifying as true and complete by the president and controller of the Borrowers, the Borrowing Base Amount and each of its components.  It was also required to provide to the Bank a "compliance certificate" within forty-five (45) days after the end of each fiscal quarter containing a computation of the financial covenants and stating that Express Grain has not become aware of any event of default.

31.     The volume of grain held by Express Grain is, predictably, greatest at the conclusion of the harvest season.  For most crops, the harvest in the Mississippi Delta occurs in the autumn.

32.     The Bank had superior knowledge of Express Grain's efforts to fill its silos with Plaintiffs and class members' grain to the benefit of the Bank and recognized this effort was key to maximizing its collateral.

**Although Express Grain Was in Financial Distress Throughout 2020 and 2021, a Fact Known to the Bank, the Bank Continued to Prop It Up, and Lied to the MDAC About Express Grain's Financial Condition**

33.     From at least 2018 (if not earlier) and continuing through 2021, Express Grain was in financial distress.

34.     In fact, its financial condition had been deteriorating for some time.  For example, cash on hand decreased from $1,200,000 in 2018, to $641,000 in 2019 down to almost zero at the end of 2020 at $3,865.

35.     Although Express Grain was in violation of the Bank's requirements limiting its operating debts to $50,000 and limiting its capital expenditures to $1,000,000, the Bank ignored these requirements and continued to enable Express Grain's operations.

36.     The Bank's awareness of Express Grain's problems was long-standing. Upon information and belief, Express Grain's financial statements were frequently delivered late, and were delivered late for the 2018, 2019 and 2020 fiscal years.  The Bank tolerated this untimely reporting.

37.     The Bank's awareness of the extent of Express Grain's financial distress is reflected by the fact that in December 2020 Express Grain was in a dire cash position. The Bank agreed to overhaul the loan agreements, which, as noted above, included a contemplated schedule to bring down the balance of the loan.

38.     The Bank's efforts to prop up Express Grain extended to falsely vouching to regulators that all was well.  In December of 2020, the MDAC received a complaint from a farmer who had not been paid by Express Grain.  An MDAC investigator contacted Express Grain, which gave the investigator assurances about Express Grain's financial condition. Express Grain told the investigator that everything was just fine and that Express Grain was simply refinancing its debts in the ordinary course of business.  Express Grain then invited the investigator to contact the Bank, which would confirm that.

39.     The investigator did that: he contacted the Bank for assurances about Express Grain's financial health.  The Bank told the MDAC investigator that Express Grain's loans were simply being refinanced as a matter of ordinary business and that everything at Express Grain was just fine.  The Bank's representations to MDAC were simply a lie.  The MDAC relied on the Bank's misrepresentations and allowed Express Grain to remain open as a grain dealer and warehouse.  The Bank's misrepresentations were made to prevent Express Grain from being shut down and to permit Express Grain to enter another season of harvest to increase collateral.  The Bank, which specializes in the area of agri-business lending fully understood the need to made such assurances to the MDAC. Had the Bank told the MDAC the truth about Express Grain's dire financial condition in December of 2020, the MDAC would have suspended the license of Express Grain, forcing it out of business, and no Mississippi farmer would have lost a dime dealing with Express Grain in 2021.

40.     Contrary to the Bank's representations to the MDAC in December 2020, the Bank had known of Express Grain's dire financial condition since at least 2018.

41.     In fact, the Bank knew that Express Grain had provided forged and fraudulent audits to the MDAC for four years, which audits had deceived the MDAC into allowing Express

Grain to continue to operate. The Bank knew that its borrower Express Grain was a criminal

enterprise, lying to the MDAC about its financial status to stay in business, and lying to Plaintiffs

and the Class to induce them to bring their grain harvests to Express Grain. The Bank knew of all

of this fraudulent and criminal activity by Express Grain but continued to give substantial

assistance and encouragement to Express Grain in its aforesaid misconduct.

42.     The Bank received notice of Express Grain's insolvency as early as 2018. Express

Grain's corporate accountant provided "going concern" letters to the Bank every year from at

least June 30, 2018, through December 30, 2021. These audits emphasized that Express Grain's

net losses were so high so as to raise doubt about Express Grain's ability to continue.

43.     Express Grain's corporate auditor Horne, LLP reported massive losses year over

year. Horne's Auditor's Report showed net losses of $9,333,150 and $2,400,028 for years ended

June 30, 2018 and 2017, respectively. For years ended June 30, 2019 and 2018, Express Grain

accumulated losses of approximately $14,000,000. For years ended June 30, 2020 and 2019,

Express Grain accumulated losses increased by approximately $7.6 million, for net losses of

$21,600,000. For the six months December 31, 2020, and June 30, 2020, and for the six months

ended December 31, 2020, Express Grain had accumulated losses of approximately $19,400,00

since its inception. According to the reports, these accumulated losses raised substantial doubt

about Express Grain's ability to continue as a going concern.

44.     While the Bank was aware of the Horne's warnings that Express Grain was a

going concern, the Bank concealed that information from the MDAC in December 2020.  The

MDAC was unaware of the accountant's warnings as Express Grain had submitted phony

financial statements to the MDAC in 2018, 2019, and 2020. Those falsified audits purported to

show Express Grain in a solid financial condition, and nowhere did they inform the MDAC that its liabilities grossly exceeded its assets.

45.     Express Grain's and the Bank's concealment of this debacle continued into 2021. Upon information and belief, the actual audited financial statement for the fiscal year ending December 31, 2020, was delivered late and was received by the Bank in the spring of 2021.  In that financial statement, upon information and belief, the auditor determined that there was substantial doubt about Express Grain's ability to continue as a going concern within one year after the date that the financial statement was issued.  The financial statement was "qualified," by the inclusion of the "going concern" warning (and, perhaps for other additional reasons, which might include a scope limitation, an issue discovered in the audit of the financials that were not pervasive, or an inadequate footnote disclosure). As in prior years, the going concern warning was not provided to the MDAC, but rather concealed by phony financials provided to the MDAC.

46.     Notwithstanding the Bank's knowledge of the "going concern" warning in Express Grain's audits, the Bank did not contact the MDAC to revise or withdraw its statements and representations as to Express Grain's financial health made in December 2020.  Having chosen previously to speak to make representations to MDAC, the Bank had an affirmative obligation to revise its earlier representations, which it failed to do.

47.     By the spring of 2021, Express Grain was effectively insolvent, kept alive only by the support of the Bank. The Bank was aware that if it called the loan then, or warned the MDAC, there would be little grain it could claim as security for Express Grain's debt. The Bank understood that if waited and called the loan in late September at the height of the harvest season for corn and soybeans, it could maximize its secured collateral position.

48.    And that is what The Bank did. The Bank simply waited until the elevator had collected as much grain as practicable during the 2021 corn and soybean harvest from unsuspecting farmers, including Plaintiffs, and then moved to call the loan and place Express Grain into bankruptcy. In short, the Bank laid a trap for Plaintiffs and the other members of the Class, a trap to steal their crops and use those crops to satisfy the massive loan it had improvidently made to Express Grain.

49.    During the course of 2021, there was an extended series of communications and negotiations between Express Grain and the Bank.  As the loans were non-performing, the Bank understood the economic pressures that Express Grain was under.

50.    Despite all this knowledge, the Bank willfully, fraudulently, intentionally and with reckless disregard informed the MDAC that all was financially sound at Express Grain, and failed to speak to correct this misinformation even after receiving a fourth "going concern" audit. The Bank fraudulently enabled Express Grain to take the farmer's grains so that the Bank could exercise dominion and control over Express Grain to the detriment of Plaintiffs and the Class.

51.    The Bank's plan to wait to call Express Grain's loan until harvest is reflected in the books. Express Grain was unable to make payments sufficient to reduce the balance of the Revolving Loan, which was contractually required to be reduced from (a maximum of) $40 million to $25 million by June 2021.  The Bank and Express Grain modified the Loan Agreement at least four times (in February, April, May and June 2021) because of Express Grain's insolvency.  The amendments permitted Express Grain to keep the balance of the Revolving Loan as high as $40 million throughout 2021.

52.    These amendments permitted Express Grain *to remain in business*, as Express Grain was simply unable to reduce the balance of the Revolving Loan as it had agreed to do back

in December 2020.  The Bank had an incentive *not* to foreclose on Express Grain in the spring, and to keep Express Grain afloat until the fall harvest season, so that Express Grain would acquire more collateral that could be foreclosed upon.

53.    The Bank could have foreclosed on Express Grain, but instead it chose to enable and sustain Express Grain for its own benefit by providing banking services that gave Plaintiffs, class members and the MDAC the imprimatur that Express Grain was in sound financial condition. But for the Bank's misrepresentation and concealment, Plaintiffs and the Class would never have delivered their grain into the hands of Express Grain and the coffers of the Bank.

**Express Grain Fraudulently Touted its Financial Health to Farmers and Aggressively Solicited Grain Deliveries**

54.    Under the terms of its agreements with the Bank, Express Grain was under pressure to maintain and report to the Bank large grain inventories. Accordingly, the Bank knew that in order to continue to borrow funds, Express Grain had to encourage farmers to deliver large volumes of grain, regardless of whether Express Grain had the ability to pay for them.

55.    In the spring of 2021, Express Grain issued a "spring update" that made sunny predictions about the future of the company.   Express Grain began by stating that there were "some exciting things going on here at Express Grain" touting that Express Grain "continue[d] with [its] growth and expansion" and affirmed that "we are able to continue to meet your needs and improve our services."  The update touted expansion to Express Grain's soybean processing plant.  It touted high market prices for corn and soybeans, and demand for soybean oil.  Most importantly, it touted its own financial condition:

> We are excited to see another crop go in the ground. We are looking forward to another busy fall, and *this time we'll be more prepared financially* having moved our fiscal year to the calendar year as opposed to June 30. June 30 is good physical cutoff for old/new crop, but the calendar fiscal year will give us more time to have our inventory financing secured and in place in time for harvest, so things will run

like normal. We all have a lot to look forward to this coming year. Let's make the most of it!

(Emphasis added).

56.     As late as September 28, 2021, Express Grain sent an email to customers that

reassured them of the solvency and its ability to pay for grain deliveries:

> Express Grain Customers and Friends,
>
> I hope everyone is having a great harvest this year. I wanted to update you all on how we are doing. This harvest Express Grain has received approximately 7.5 million bushels of corn!  This is the 2nd largest in our history just behind 2013. A lot of this was made possible due to the inverted market and high moisture harvesting program. We have shipped approximately 6.5 million bushels of corn out to the market. We have to thank the CN railroad for doing an excellent job of keeping trains rolling in and out of our Sidon Facility, and for you getting it out of the field! We are so thankful a large portion got their corn out of the field and to market before the Hurricane. Soybeans are rolling in as well. Due to issues with the river this year, we are definitely going to see more bushels come our way. We are steadily crushing beans, and will start shipping trains of beans so we have ample space for everyone. *I also wanted to let you know that we are in good shape financially. We have funding in place from multiple sources to make sure everyone gets paid on time. Stay safe out there and keep those combines rolling!*
>
> Sincerely,
> John Coleman
> President
> Express Grain Terminals

(Emphasis added).

57.     At the time Express Grain made the foregoing representations, the Bank knew

these public pronouncements and solicitations were false, as Express Grain was teetering on

bankruptcy. The Bank remained silent, knowing that these misrepresentations by its agent would

induce farmers to deliver their crops to Express Grain. The Bank allowed these

misrepresentations to be made and made no effort to correct them.

58.     Express Grain with the acquiescence and encouragement of the Bank, hired

agents to visit farmers during the summer and even offered bonuses and other inducements such

as accepting grain with an excessive moisture content, in order to convince more farmers to deliver more grain to Express Grain.

59.     The Bank knew that Express Grain's financial condition was dire, and that it would be unable to pay for the voluminous grain deliveries it would receive in harvest season.

60.     The Bank had superior knowledge about Express Grain's financial condition than Plaintiffs, the Class, and other farmers had.

61.     Express Grain and the Bank had a duty to disclose the adverse financial condition of Express Grain to Plaintiffs, the Class, and the MDAC because (1) this information was necessary and material to transactions entered by farmers with Express Grain, (2) was necessary to render not misleading affirmative statements made by Express Grain and the Bank about the financial condition of Express Grain, and (3) Express Grain and the Bank had special knowledge about these facts that was not possessed by Plaintiffs and other farmers.

62.     Farmers, including Plaintiffs and the Class, relied to their detriment on the purported financial health of Express Grain.  If Plaintiffs had known of Express Grain's inability to pay, they would not have delivered their crops to Express Grain, and would have, instead, brought them elsewhere.

63.     Due to the Bank's and Express Grain's affirmative misrepresentations about Express Grain's financial condition, and their failure to disclose Express Grain's distressed financial condition, Plaintiffs and the Class continued to deliver grains to Express Grain during the fall harvest season.

64.     For example, Island Farms, LLC delivered 80,000 bushels of corn to Express Grain on or about September 13-18, 2021.   Express Grain "paid" Island Farms with a check for $410,874.33. The check bounced on 9/29/2021.

65.     By September 29, 2021, as is typical during harvest season, Express Grain's silos were filling up with grains.

66.     The only beneficiary of these grain deliveries was the Bank.  The Bank benefitted by the delivery of additional collateral that it could later foreclose upon.

67.     But the farmers who delivered grains to Express Grain in this time frame were *not* paid for their deliveries.  In fact, several checks to farmers written by Express Grain bounced. Instead of being paid for their deliveries, the farmers were, in effect, just handing their crops to the Bank without any compensation.

### The Bank Springs the Trap

68.     On September 24, 2021, the Bank gave notice to Express Grain that the Bank had "elected to accelerate the Indebtedness, and declared all amounts owing under the Loan Documents immediately due and payable in full."

69.     On or about September 28, 2021, the Bank filed a petition, styled *UMB Bank, N.A. v. Express Grain Terminals, LLC, et al.*, No. 21-CV-106 (Chancery Ct. Leflore Cnty., Miss.), seeking the appointment of a receiver over Express Grain. By filing the petition for receivership, the Bank furthered its scheme to take possession of farmers' grain and it proceeds. The Bank unreasonably exercised dominion and control over the grain and its proceeds. The receivership petition furthered the Bank's goal to take possession of the grain, sell it, and get the proceeds for itself.

70.     The Bank knew that its filing of the receivership petition would cause Express Grain to seek the protection of the bankruptcy laws.

71.     On or about September 29, 2021, Express Grain and its related entities filed a series of petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Mississippi.

72.     The Bank has essentially taken legal title to the grains delivered by Plaintiffs and the Class, based on the security interest provided by its agreements with Express Grain.

## CLASS ACTION ALLEGATIONS

73.     This action is brought as a class action pursuant to Fed. R. Civ. P. 23(b)(3). Plaintiffs bring this action on their own behalf, and on behalf of all others similarly situated, as representatives of the following Class:

> All persons and entities that deposited agricultural products with Express Grain, and who did not receive full payment for those products, from January 1, 2020, to October 31, 2021.

> Excluded from the Class are persons directly or indirectly owned or operated by Defendants or Defendants' affiliated entities, and federal, state, and local government entities.

74.     The members of the Class are readily identifiable from the records of Express Grain.

75.     Upon information and belief, the Class consists of hundreds of members, and is therefore so numerous that individual joinder of all members is impracticable.

76.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class.  The wrongs suffered and remedies sought by Plaintiffs and the other members of the Class are premised upon a uniform unlawful scheme perpetuated by Defendants.  Questions common to the Class include, but are not limited to, the following:

(a) Did Express Grain and the Bank fraudulently misrepresent the financial condition of Express Grain?

(b) Did Express Grain and the Bank have a duty to accurately disclose to farmers and the MDAC the financial condition of Express Grain?

(c) Did the Bank fraudulently misrepresent Express Grain's financial condition to the MDAC?

17

(d)  Did the Bank know that Express Grain was financially distressed?

(e)  When did the Bank know that Express Grain was financially distressed?

(f)  Did the Bank prop up Express Grain until the fall 2021 harvest season?

(g)  Did the Bank benefit from Express Grain's fraudulent conduct?

(h)  Would it be unjust for the Bank to retain its benefits from Express Grain's wrongful conduct, or its own fraudulent conduct?

(i)  Did the Bank exercise exclusive dominion or control over grain delivered to Express Grain?

(j)  Whether Plaintiffs and the Class have been damaged as a result of the Bank's actions;

(k)  Whether Plaintiffs and the Class are entitled to equitable relief;

(l)  Whether Plaintiffs and the Class are entitled to punitive damages; and

(m) Whether Plaintiffs and the Class are entitled to attorneys' fees and costs.

77.     Plaintiffs' claims are typical of those of the Class, and are based on the same legal theories as those of the Class members.  Plaintiffs' claims and those of the Class members all arise from the same pattern or practice by the Defendants, set out above.

78.     Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained counsel who are highly experienced and competent in complex consumer class-action litigation, and Plaintiffs and their counsel intend to prosecute this action vigorously.  Neither Plaintiffs nor their counsel have any interests that might cause them not to vigorously pursue this action.  Plaintiffs' interests are coextensive with those of the Class, and Plaintiffs have no interests adverse to those of the Class members.

79.     Plaintiffs have made arrangements with their counsel for the discharge of their financial responsibilities to the Class.  Plaintiffs' counsel have the necessary financial resources to adequately and vigorously litigate this class action.

80.     A class action is superior to all other available means for the fair and efficient adjudication of this controversy. It is desirable to concentrate the litigation of the claims in this forum, because the damages suffered by the individual Class members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. Moreover, the individual Class members are unlikely to be aware of their rights. Thus, it is unlikely that the Class members, on an individual basis, can obtain effective redress for the wrongs done to them. Additionally, the court system would be adversely affected by such individualized litigation. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase delay and expense to all parties and the court system from the issues raised by this action. In contrast, the class-action device provides the benefit of adjudication of these issues in a single proceeding, with economies of scale and comprehensive supervision by a single court.

## Issues Class

81.     Plaintiffs seek, in the alternative or prior to certification, an Issues Class.

82.     Rule 23 (b)(4) provides that an action may be brought or maintained as a class action with respect to particular issues when doing so would materially advance the litigation as a whole.

83.     In an effort to materially advance the litigation as a whole, pursuant to Rule 23 (b)(4), Plaintiffs bring this action on behalf of themselves and of all others similarly situated to resolve, *inter alia*, several important issues:

(a)  Whether the Bank aided and abetted Express Grain's fraud;

(b)  Whether the Bank committed fraud;

(c)  Whether the Bank is liable for conversion;

19

(d) Whether the Bank acted grossly negligently;

(e) Whether the Bank was unjustly enriched by its conduct; and

(f) Whether a constructive trust should be imposed.

## CLAIMS FOR RELIEF

### COUNT I
### FRAUD

84.     Paragraphs 1 through 83 are incorporated here by reference, as if set forth in full.

85.     Express Grain and the Bank intentionally and unlawfully (1) knowingly made false representations to the MDAC intending that the representations be relied upon by the MDAC, and by farmers, including Plaintiffs, and (2) intentionally omitting and/or concealing information that they had a duty to disclose to the MDAC.

86.     If the Bank had told the truth to the MDAC, after it learned of the forged audit submitted by Express Grain to the MDAC in January 2019, and after it first learned of Express Grain's dire financial situation well before then, or in December 2020, or in the Spring of 2021, the MDAC would have shut Express Grain down, and Plaintiffs and class members would have sold their 2021 crops elsewhere.

87.     The Bank knew or should have known Plaintiffs and the Class fell within the group of persons for whose benefit the information was supplied. The Bank assumed a public duty in responding to an investigation by the MDAC. The Bank benefitted from its misstatements by asserting possessory rights over the grain thereby strengthening their liability to plaintiffs for their misstatements.

88.     The Bank is liable not only for its misstatements to the MDAC, but also for its ongoing failure to correct those misstatements.  The Bank undertook to provide financial

information to the MDAC. In so doing, it is liable for its fraudulent statements as well as its failure to correct them.

89.    Plaintiffs and the Class relied on the Bank's misrepresentations to the MDAC. The Bank's fraudulent misrepresentations and omissions mislead Plaintiffs and the Class resulting in economic loss and damage. These misrepresentations, omissions, and concealments were: a) false, b) the Bank knew they were false or acted with reckless disregard for their veracity; and c) were material.  The Bank intended the MDAC, Plaintiffs, and the Class to act on them as set forth above.  The MDAC, Plaintiffs, and the Class did not know of their falsity and relied on them to their consequent and proximate injury and damage.

90.    The Bank knew that Plaintiffs and other farmers would rely on its misrepresentations or omissions.

91.    The Bank had actual knowledge of the insolvency of Express Grain for years prior to 2021.  This knowledge came from audited financial reports, from the transactions Express Grain had with various accounts at the Bank as well as through the right of the Bank to enter and inspect all information at Express Grain pursuant to loan agreements.  As a result of this superior knowledge, the Bank was well aware of the course of dealings of Express Grain with farmers.  In 2021, not only did the Bank rework loan agreements with Express Grain four (4) times, it changed its course of dealing with the grain delivered by Plaintiffs and the Class.  As further evidence of bad faith and fraud, the Bank altered its practices and required Express Grain to issue warehouse receipts to the Bank to leverage its claim of ownership of any grain delivered by Plaintiffs and the Class and thereby claiming the grain as its own.

92.    As a result of the Bank's fraud, Plaintiffs and the Class have been damaged.

## COUNT II
## CIVIL CONSPIRACY TO COMMIT FRAUD

93.     Paragraphs 1 through 92 are incorporated here by reference, as if set forth in full.

94.     Plaintiffs bring this claim under Mississippi common law of civil conspiracy, providing for the civil liability of persons who conspire to commit one or more unlawful acts.

95.     The Bank and Express Grain (a co-conspirator not named as a defendant herein) engaged in a common design between two or more persons to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, an overt act in furtherance of the conspiracy, and resulting injury to Plaintiffs and the Class.

96.     The Bank and Express Grain engaged in a combination and an agreement to act in concert in the defrauding of Plaintiffs and similarly situated persons.

97.     The Bank engaged in one or more unlawful activities to further the conspiracy. The object of the conspiracy was to cause farmers to believe that Express Grain was in good financial health so that they would continue to do business with Express Grain.

98.     In furtherance of the conspiracy, Express Grain and the Bank intentionally and unlawfully (1) made knowingly false representations to the MDAC intending that the representations be relied upon by the MDAC, and by farmers, including Plaintiffs, and (2) intentionally omitting and/or concealing information that they had a duty to disclose to the MDAC and to Plaintiffs and the class.

99.     Express Grain and the Bank affirmatively misrepresented that the financial condition of Express Grain was strong, and failed to disclose that is financial condition was actually quite dire.

100.    The Bank had actual knowledge of the insolvency of Express Grain for years prior to 2021.  This knowledge came from audited financial reports, from the transactions

22

Express Grain had with various accounts at the Bank as well as through the right of the Bank to enter and inspect all information at Express Grain pursuant to loan agreements.  As a result of this superior knowledge, the Bank was well aware of the course of dealings of Express Grain with farmers.  In 2021, not only did the Bank rework loan agreements with Express Grain four (4) times, it changed its course of dealing with the grain delivered by Plaintiffs and the Class.  As further evidence of bad faith and fraud, the Bank altered its practices and required Express Grain to issue warehouse receipts to the Bank to leverage its claim of ownership of any grain delivered by Plaintiffs and the Class and thereby claiming the grain as its own.

101.    Express Grain's and the Bank's misrepresentations were designed to induce reliance.

102.    Express Grain and the Bank had a duty to disclose the adverse financial condition of Express Grain to Plaintiffs and other class members with whom it did business, because (1) this information was necessary and material to transactions entered by farmers with Express Grain, (2) was necessary to render not misleading affirmative statements made by Express Grain and the Bank about its financial condition, and (3) Express Grain had special knowledge about these facts that was not possessed by Plaintiffs and other farmers.

103.    The Bank could have foreclosed on Express Grain, but instead it chose to enable and sustain Express Grain by providing banking services that led Plaintiffs, class members and the MDAC to believe that Express Grain was in sound financial condition. By its silence, the Bank lent legitimacy and cover to Express Grain while it waited for farmers to deliver more collateral to Express Grain.

104.    As a result of these representations and/or omissions, Plaintiffs and the Class delivered grain to Express Grain that they would not have delivered had they known the truth.

23

105.    Express Grain's and the Bank's false representations and omissions were material and were made and omitted intentionally and recklessly.

106.    The Bank knew or should have known of the violation by Express Grain.

107.    The Bank gave substantial assistance and/or encouragement to Express Grain to engage in the tortious conduct.

108.    As a result of the fraudulent conduct of the conspiracy between the Bank and Express Grain, Plaintiffs and the Class have been damaged.

**COUNT III**
**AIDING AND ABETTING FRAUD**

109.    Paragraphs 1 through 108 are incorporated here by reference, as if set forth in full.

110.    Express Grain and the Bank intentionally and unlawfully (1) made knowingly false representations to the MDAC intending that the representations be relied upon by the MDAC, and by farmers, including Plaintiffs, and (2) intentionally omitting and/or concealing information that they had a duty to disclose to the MDAC.

111.    Express Grain affirmatively misrepresented that its financial condition was strong, and failed to disclose that is financial condition was actually quite dire.

112.    Express Grain's misrepresentations were designed to induce reliance.

113.    Express Grain had a duty to disclose its adverse financial condition to Plaintiffs and other farmers with whom it did business, because (1) this information was necessary and material to transactions entered by farmers with Express Grain, (2) was necessary to render not misleading affirmative statements made by Express Grain about its financial condition, and (3) Express Grain had special knowledge about these facts that was not possessed by Plaintiffs and other farmers.

114.   As a result of these representations and/or omissions, Plaintiffs and the Class delivered grain to Express Grain that they would not have delivered had they known the truth.

115.   Express Grain's false representations and omissions were material and were made and omitted intentionally and recklessly.

116.   The Bank knew with a high degree of scienter that the conduct of Express Grain constituted a breach of duty.  The Bank had actual or constructive knowledge of Express Grain's fraudulent conduct and details of the surrounding facts. The Bank had extensive involvement with Express Grain.  The Bank had been Express Grain's banker since at least 2015 and knew the facts about Express Grain as set out herein.

117.   The Bank knew or should have known of the false representations and omissions by Express Grain.

118.   The Bank gave substantial assistance and/or encouragement to Express Grain to engage in the tortious conduct.

119.   The Bank aided and abetted the fraud perpetrated by Express Grain by affirmatively misrepresenting to the MDAC that Express Grain was in good financial health, remaining silent (vis a vis Plaintiffs and other farmers) with full knowledge that Express Grain's customers would deliver their products without being paid for them, and propping up Express Grain until such time, and only until such time, as area farmers, including Plaintiffs and the Class, would deliver their crops during harvest season.

120.   The Bank could have foreclosed on Express Grain, but instead it chose to enable and sustain Express Grain by providing banking services that gave Plaintiffs, class members and the MDAC the imprimatur that Express Grain was in sound financial condition. By its silence,

the Bank lent legitimacy and cover to Express Grain while it waited for farmers to deliver more collateral to Express Grain.

121.    As a result of the Bank's aiding and abetting Express Grain's fraudulent conduct, Plaintiffs and the Class have been damaged.

<u>COUNT IV</u>
<u>NEGLIGENCE, GROSS NEGLIGENCE, AND RECKLESSNESS</u>

122.    Paragraphs 1 through 121 are incorporated here by reference, as if set forth in full.

123.    "Negligence is a failure to do what the reasonable person would do under the same or similar circumstances." *Estate of St. Martin v. Hixson*, 145 So. 3d 1124, 1128 (Miss. 2014).

124.    While negligence is the failure to exercise due care, recklessness "is a failure or refusal to exercise any care." *Maldonado v. Kelly*, 768 So. 2d 906, 910 (Miss. 2000).

125.    Express Grain and the Bank intentionally and negligently (1) made knowingly false representations to the MDAC intending that the representations be relied upon by the MDAC, and by farmers, including Plaintiffs, and (2) intentionally omitting and/or concealing information that they had a duty to disclose to the MDAC and to Plaintiffs and the class.

126.    The Bank failed to use ordinary care.  A bank has a duty to exercise ordinary care in dealing with the MDAC, the farmers' de facto agent.  Further, once the Bank elected to supply information to the MDAC investigator, a heightened relationship arose in an area of public trust giving rise to a fiduciary relationship.  The Bank failed to exercise ordinary care in ensuring the accuracy of its reporting to the MDAC thereby enabling Express Grain's schemes, proximately causing injury to farmers.  The Bank's actions rose to the level of gross negligence and displayed a reckless indifference to consequences without substantial effort to avoid them.  The Bank's conduct was so far from a proper state of mind that it considered as if harm was intended.

127.     Express Grain and the Bank affirmatively misrepresented that the financial condition of Express Grain was strong, and failed to disclose that is financial condition was actually quite dire.

128.     It was reasonably foreseeable that Express Grain's and the Bank's misrepresentations would harm Plaintiffs and the Class.

129.     The Bank not only failed to exercise due care, it failed or refused to exercise any care at all in its dealings with Express Grain or the MDAC.

130.     The Bank's recklessness, or at a minimum negligence, allowed Express Grain to continue to collect collateral in the form of farmers' grain. As a result of the Bank's negligence, Plaintiffs and the Class delivered grain to Express Grain that they would not have delivered had they known the truth, that Express Grain was insolvent.

131.     If the Bank had told the truth to the MDAC, either in December 2020, or in the Spring of 2021, the MDAC would have shut Express Grain down, and Plaintiffs and class members would have sold their 2021 crops elsewhere.

132.     The Bank knew that Plaintiffs and other farmers would rely on its misrepresentations or omissions.

133.     As a result of the Bank's negligence, gross negligence, and recklessness, Plaintiffs and the Class have been damaged.

## COUNT V
## NEGLIGENT MISREPRESENTATION

134.     Paragraphs 1 through 133 are incorporated here by reference, as if set forth in full.

135.     Plaintiffs and the Class relied on the Bank's misrepresentations to the MDAC. The Bank's misrepresentations and omissions mislead Plaintiffs and the Class resulting in economic loss and damage. These misrepresentations and omissions were: a) false, b) the Bank

knew they were false or acted with reckless disregard for their veracity; and c) were material.

The Bank intended the MDAC, Plaintiffs, and the Class to act on them as set forth above.

Plaintiffs and the Class did not know of their falsity and relied on them to their consequent and

proximate injury and damage.

136.    The Bank intentionally and unlawfully (1) made false representations to the

MDAC intending that the representations be relied upon, and (2) intentionally omitting and/or

concealing information that it had a duty to disclose.

137.    The Bank affirmatively misrepresented that the financial condition of Express

Grain was strong, and failed to disclose that its financial condition was actually quite dire.

138.    The Bank's misrepresentations were designed to induce reliance.

139.    The Bank's false representations and omissions were material and significant, and

were made and omitted intentionally and recklessly.

140.    The Bank failed to exercise a reasonable degree of diligence the public is entitled

to expect.

141.    The Bank had a duty to disclose the adverse financial condition of Express Grain

to Plaintiffs and other farmers with whom it did business, because (1) this information was

necessary and material to transactions entered by farmers with Express Grain, (2) was necessary

to render not misleading affirmative statements made by Express Grain and the Bank about the

financial condition of Express Grain, and (3) Express Grain and the Bank had special knowledge

about these facts that was not possessed by Plaintiffs and other farmers.

142.    Once the Bank undertook to provide information to the MDAC, it had a duty to

exercise reasonable care and diligence to see that that the information was accurate and to

affirmatively correct any inaccuracies in that information. When a bank makes representations or

omissions of material facts it knows to be false and has not exercised reasonable care and

diligence to see that the information dispensed is accurate, the bank may incur a liability.

143.    As a result of these representations and/or omissions, Plaintiffs and the Class

delivered grain to Express Grain that they would not have delivered had they known the truth.

144.    If the Bank had told the truth to the MDAC, either in 2018, or in 2019, or

December 2020, or in the Spring of 2021, the MDAC would have shut Express Grain down, and

Plaintiffs and class members would have sold their 2021 crops elsewhere.

145.    As a result of the Bank's negligent and grossly negligent misrepresentation,

Plaintiffs and the Class have been damaged.

## COUNT VI
## UNJUST ENRICHMENT

146.    Paragraphs 1 through 145 are incorporated here by reference, as if set forth in full.

147.    At no time was there a contract between Plaintiffs and the Bank, but the law

applies quasi-contractual duties between them. The doctrine of unjust enrichment or recovery in

quasi-contract applies to situations where there is no legal contract but where the person sought

to be charged is in possession of money or property which in good conscience and justice he

should not retain but should deliver to another, and the courts impose a duty to refund the money

or the use value of the property to the person to whom in good conscience it ought to belong.

148.    The Bank intentionally and unlawfully (1) made knowingly false representations

to the MDAC intending that the representations be relied upon, and (2) intentionally omitting

and/or concealing information that it had a duty to disclose.

149.    The Bank affirmatively misrepresented that the financial condition of Express

Grain was strong and failed to disclose that its financial condition was actually quite dire.

150.    The Bank's misrepresentations were designed to induce reliance.

151.   The Bank had a duty to disclose the adverse financial condition of Express Grain to Plaintiffs and other farmers with whom it did business, because (1) this information was necessary and material to transactions entered by farmers with Express Grain, (2) was necessary to render not misleading affirmative statements made by Express Grain and the Bank about the financial condition of Express Grain, and (3) Express Grain and the Bank had special knowledge about these facts that was not possessed by Plaintiffs and other farmers.

152.   As a result of these representations and/or omissions, Plaintiffs and the Class delivered grain to Express Grain that they would not have delivered had they known the truth.

153.   Express Grain's and the Bank's false representations and omissions were material and were made and omitted intentionally and recklessly.

154.    The Bank aided and abetted the fraud perpetrated by Express Grain by remaining silent with full knowledge that Express Grain's customers would deliver their products without being paid for them, and propping up Express Grain until such time, and only until such time, as area farmers, including Plaintiffs and the Class, would deliver their crops during harvest season.

155.   The Bank was the beneficiary of the fraud perpetrated by Express Grain.

156.   The Bank had actual knowledge of the insolvency of Express Grain for years prior to 2021.  This knowledge came from audited financial reports, from the transactions Express Grain had with various accounts at the Bank as well as through the right of the Bank to enter and inspect all information at Express Grain pursuant to loan agreements.  As a result of this superior knowledge, the Bank was well aware of the course of dealings of Express Grain with farmers.  In 2021, not only did the Bank rework loan agreements with Express Grain four (4) times, it changed its course of dealing with the grain delivered by Plaintiffs and the Class.  As further evidence of bad faith and fraud, the Bank altered its practices and required Express Grain

to issue warehouse receipts to the Bank to leverage its claim of ownership of any grain delivered by Plaintiffs and the Class and thereby claiming the grain as its own.

157.    The Bank was enriched by increasing its profits, or alternatively substantially mitigating its losses, at the expense of farmers who delivered grain, without compensation, to Express Grain on the eve of its bankruptcy.

158.    The Bank has taken and holds property of Plaintiffs and all the members of the class which in good conscience, equity and justice, the Bank should not retain.

159.    The Bank has been enriched unjustly at the expense of Plaintiffs and the Class.

160.    Therefore, Plaintiffs demand disgorgement of all ill-gotten funds, gains, profits and benefits received by The Bank as a result of its conduct, and the wrongful conduct of Express Grain.

<u>**COUNT VII**</u>
<u>**CONSTRUCTIVE TRUST**</u>

161.    Paragraphs 1 through 160 are incorporated here by reference, as if set forth in full.

162.    The Bank intentionally and unlawfully (1) made knowingly false representations to the MDAC intending that the representations be relied upon, and (2) intentionally omitting and/or concealing information that it had a duty to disclose.

163.    The Bank affirmatively misrepresented that the financial condition of Express Grain was strong and failed to disclose that its financial condition was actually quite dire.

164.    The Bank's misrepresentations were designed to induce reliance.

165.    The Bank had a duty to disclose its adverse financial condition to Plaintiffs and other farmers with whom Express Grain did business, because (1) this information was necessary and material to transactions entered by farmers with Express Grain, (2) was necessary to render not misleading affirmative statements made by Express Grain and the Bank about its financial

31

condition, and (3) Express Grain and the Bank had special knowledge about these facts that was not possessed by Plaintiffs and other farmers.

166.    As a result of these representations and/or omissions, Plaintiffs and the Class delivered grain to Express Grain that they would not have delivered had they known the truth.

167.    The Bank's false representations and omissions were material and were made and omitted intentionally and recklessly.

168.    The Bank knew at all material times of the aforesaid misconduct by Express Grain.

169.    The Bank gave substantial assistance and/or encouragement to Express Grain to engage in the tortious conduct.

170.    The Bank conspired to commit fraud perpetrated by Express Grain.  The Bank aided and abetted the fraud perpetrated by Express Grain by remaining silent with full knowledge that Express Grain's customers would deliver their products without being paid for them, and propping up Express Grain until such time, and only until such time, as area farmers, including Plaintiffs and the Class, would deliver their crops during harvest season.

171.    A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, to hold and enjoy.

172.    The Bank obtained ownership of the farmers' crops and their proceeds by means involving misrepresentations, as listed, and inequitable means, as listed, made by Express Grain.

173.     The misrepresentations include fraud, artifice, concealment, and failing to disclose.

174.     The listed misrepresentations include, but are not limited to, those to the effect that the Express Grain was in good financial condition, would pay the farmers for crops, was not near insolvency, and that its payments by check or otherwise were sound.

175.     The listed inequitable means include unconscionable conduct, artifice, or questionable means, or against equity and good conscience, obtaining or holding the legal right to the farmers' grain, which the Bank ought not, in equity and good conscience, to hold and enjoy.

176.     The listed inequitable means include, but are not limited to, tactics to induce farmers to surrender possession of their grain, take payments by check or otherwise that were not sound, make Express Grain appear in good financial condition and not near insolvency, and sell or transfer the farmers' grain to buyers or other transferees, whether or not the grain continued to be proceeds from the farmers' sale.

## DAMAGES AND OTHER RELIEF SOUGHT

177.     Paragraphs 1 through 176 are incorporated here by reference, as if set forth in full.

178.     Plaintiffs seek certification of a Class of similarly situated persons as defined above.

179.     As a result of Defendants' aforesaid misconduct, Plaintiffs seek recovery, for themselves and the Class, of all available damages, including—but not limited to—compensatory, punitive and exemplary.

180.     Plaintiffs seek forfeiture, for themselves and the Class, of all money received by Defendants, directly or indirectly, through the conduct alleged herein.

181.    Plaintiffs seek restitution, for themselves and the Class, of all illegally obtained or ill-gotten funds and gains received by the Defendants

182.    Plaintiffs seek pre-judgment interest, post-judgment interest, attorneys' fees, court costs, investigative costs, expert-witness fees, deposition fees and any other expenses or damages which this Court deems proper.

## JURY TRIAL DEMAND

183.    Plaintiffs demand a jury trial.

Dated: January 11, 2022            /s/ *Don Barrett*
_____
John W. ("Don") Barrett (MSB #2063)
Katherine Barrett Riley (MSB #99109)
David McMullan, Jr. (MSB #8494)
Sterling Aldridge (MSB #104277)
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095
Telephone: (662) 834-2488
donbarrettpa@gmail.com
kbriley@barrettlawgroup.com
dmcmullan@barrettlawgroup.com
saldridge@barrettlawgroup.com

Jonathan W. Cuneo (*pro hac vice* to be submitted)
Monica Miller (*pro hac vice* to be submitted)
Jennifer E. Kelly (*pro hac vice* to be submitted)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
monica@cuneolaw.com
jkelly@cuneolaw.com

Charlie Merkel (MSB #2884)
John Cocke (MSB # 6326)
Ted Connell (MSB #1647)
Chris Winter (MSB #10300)
**Merkel And Cocke**
P O Box 1388
Clarksdale, MS 38614

662 627 9641
cmerkel@merkel-cocke.com
jcocke@merkel-cocke.com
tconnell@merkel-cocke.com
cwinter@merkel-cocke.com

Michael T. Lewis, Sr (MSB #1238)
Pauline Shuler Lewis (MSB #1239)
**Lewis And Lewis Attorneys**
P O Box 2430
Oxford, MS 38655
662 832 8569
mike@lewisattorneys.com
pauline@lewisattorneys.com

Gerald M. Abdalla (MSB # 101213)
**Abdalla Law, PLLC**
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
(601) 278-6055 t
(601) 487-4595 f
jerry@abdalla-law.com

E. Carlos Tanner, III (MSB# 102703)
**TANNER & ASSOCIATES, LLC**
263 E. Pearl Street
Jackson, Mississippi 39201
carlos.tanner@thetannerlawfirm.com
601.460.1745 (Telephone)
662.796.3509 (Facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I electronically filed the foregoing with the Clerk of the

Court using the ECF system which sent notification of such filing to all counsel of record.

This the 11th day of January 2022.

/s/ *Don Barrett*
John W. ("Don") Barrett